ALLEN SZARWAK *v.* WARDEN OF CONNECTICUT
CORRECTIONAL INSTITUTION, SOMERS

SUPERIOR COURT      HARTFORD COUNTY      FILE NO. 183086

Memorandum filed May 10, 1974

*Leonard I. Shankman,* of Hartford, for the plaintiff.

*John F. Mulcahy, Jr.,* deputy chief state's attorney, and *Robert E. Beach, Jr.,* for the defendant.

PARSKEY, J. The plaintiff was sentenced in Circuit Court 14 to the correctional center at Somers for a term of not less than eighteen months nor more than three years. He claims that this sentence is illegal because (1) the prosecutor failed to disclose to the court all of the material terms of the plea bargain; (2) the court, in rejecting the recommended sentence, refused to permit the plaintiff to withdraw his guilty plea; and (3) the sentence imposed exceeded the constitutionally permitted jurisdiction of the Circuit Court.

The plaintiff was initially charged with seven counts of receiving stolen credit cards and seven counts of larceny by receiving stolen property. On May 17, 1973, to a substitute complaint charging single counts of these crimes, the plaintiff, who was represented by the public defender, entered pleas of not guilty and elected trial by jury. The next day, during the course of the trial and as the result of a plea bargain between the prosecutor and the plaintiff's counsel, the plaintiff was permitted to withdraw his pleas and election. The plaintiff then entered a plea of guilty to the crime of receiving stolen credit cards. This crime is a class D felony, carrying a maximum penalty of five years. General Statutes §§ 53a-128c (e), 53a-128i (b). The state nolled the other count. Upon inquiry by the court respecting plea negotiations, the negotiating prosecutor reported an agreed recommendation for a sentence of not less than one year nor more than two years, concurrent with the balance of a term for burglary from which the plaintiff had heretofore been released on parole. The trial judge advised the

plaintiff that the trial judge was not obliged to accept this recommendation or any other recommendation that the prosecutor might make with respect to the ultimate disposition of the case, and the plaintiff acknowledged that he so understood.

On June 15, 1973, just prior to sentencing, the plaintiff moved to withdraw his guilty plea, claiming, inter alia, that it was his understanding that the court was bound to go along with the state's recommendation. The trial judge reminded the plaintiff that the trial judge had previously explained to him that the court was not bound by the recommendation and that the plaintiff had so understood at the time. The public defender advised the trial judge of negotiations he had with the prosecutor in which the negotiating prosecutor had indicated that he would not object to the withdrawal of the guilty plea at any time and that the public defender had so notified the plaintiff. The negotiating prosecutor was not present at the time of sentencing; in his place the state was represented by another prosecutor. Upon inquiry by the trial judge, the sentencing prosecutor stated that he was not familiar with any prior discussions and objected to the withdrawal of the guilty plea although he assumed that he was bound by any promises made by the other prosecutor. The court denied the plaintiff's motion and thereupon, after further inquiry of the parties respecting the sentence to be imposed, imposed the sentence referred to above.

The agreement entered into between the public defender and the negotiating prosecutor was that the state would recommend a sentence of no less than one nor more than two years and that if the trial judge did not go along with the recommended sentence the state would not oppose the plaintiff's withdrawal of his guilty plea. There is no evidence that either the negotiating or the sentencing prose-

cutor advised the trial judge at any time about the agreement respecting withdrawal of the plaintiff's guilty plea. The sentencing prosecutor, who was aware of this part of the agreement, believed that it did not become operative unless the motion to withdraw was made after the sentence was imposed, and since the motion was not renewed at that time he felt justified in remaining silent.

"A plea of guilty differs in purpose and effect from a mere admission or an extra-judicial confession; it is itself a conviction. Like a verdict of a jury it is conclusive. More is not required; the court has nothing to do but give judgment and sentence. Out of just consideration for persons accused of crime, courts are careful that a plea of guilty should not be accepted unless made voluntarily after proper advice and with full understanding of the consequences." *Kercheval* v. *United States,* 274 U.S. 220, 223; *State* v. *Carta,* 90 Conn. 79, 81. A guilty plea, if induced by promises or threats which deprive it of the character of a voluntary act, is void and open to collateral attack. *Machibroda* v. *United States,* 368 U.S. 487, 493. Although there is no absolute right to have a guilty plea accepted; *Lynch* v. *Overholser,* 369 U.S. 705, 719; when that plea is induced by promises arising out of a plea bargaining agreement, fairness requires that such promises be fulfilled. *Santobello* v. *New York,* 404 U.S. 257, 262. Failure to fulfil them compels the court, in its discretion, either to order specific performance of the agreement or to permit an opportunity to withdraw the guilty plea.

The agreement in this case not only involved a recommended sentence but also was that the state would not oppose a withdrawal of the guilty plea in the event that the sentencing judge did not accept the recommendation. Whether, in the circumstances, the sentencing judge was obligated to permit a with-

drawal of the guilty plea; *United States ex rel. Culbreath* v. *Rundle,* 466 F.2d 730, 735; ABA Standards Relating to the Function of the Trial Judge § 4.1 (c), p. 57 (1972); it is unnecessary to decide. It is sufficient to invalidate the conviction that the prosecutor, by objecting to the withdrawal, broke his promise. It is of no consequence that the sentencing prosecutor had not been a party to the plea negotiations. The prosecutor's office is a single unit; the left hand is deemed to know what the right hand is doing. It is of no moment that the sentencing judge might not or would not have been influenced by the absence of objection by the prosecutor to the withdrawal. The prosecutor's duty to carry out his part of the plea bargain does not depend upon its effect. It is immaterial whether his failure to discharge his duty is deliberate or inadvertent. Its impact is no less in either event. Nor is it material whether the motion to withdraw is made before or after the imposition of sentence, so long as the sentencing judge was not prepared to accept the recommended sentence and did, in fact, impose a more severe sentence. The primary duty of a prosecutor is not to convict but to see that justice is done. *State* v. *Zimnaruk,* 128 Conn. 124, 127. It is not consonant with that duty for a prosecutor to play the game of "May I?" with the liberty of a criminal defendant.

The defendant points to the circumstances surrounding the guilty plea—the commencement of the trial, the state's summoning of many witnesses, the termination of the trial at the request of the plaintiff, the present unavailability of one of the state's witnesses, and the possible prejudice to the state's case as a result—and suggests that these factors should outweigh the supposed failure of the prosecutor to carry out the terms of the plea bargain, by objecting to the withdrawal of the guilty plea. The difficulty with the defendant's position is that it is

the plaintiff who has in fact been prejudiced and it cannot be said that the prosecutor's action did not contribute to it. Whatever prejudice the state may have sustained is problematic and could have been avoided had the prosecutor alerted the trial judge to the entire agreement at the time of the guilty plea. Had the trial judge declined to accept the agreement, then both the state and the plaintiff could have reexamined their positions in the light of the court's position or, in the alternative, the trial could have proceeded to verdict. The defendant's claim of prejudice to the state is not only not convincing but, when measured against the plaintiff's constitutionally deficient guilty plea, pales into insignificance.

Since the plaintiff's conviction cannot stand, the question arises as to the appropriate remedy. *Santobello* v. *New York,* 404 U.S. 257, suggests three alternatives. The majority opinion leaves it to the trial court to determine whether specifically to enforce the agreed sentence or to permit a withdrawal of the plea. Id., 263. Douglas would leave the option with the petitioner. Id., 267. Marshall would limit relief to that requested by the petitioner, viz., vacation of the guilty plea. Id., 268. The application of these remedies to the present case requires further analysis.

The Circuit Court is a lower state court, created by the General Assembly; Conn. Const. art. V § 1; whose powers and jurisdiction are defined by law. *Collins* v. *York,* 159 Conn. 150, 161. Its criminal jurisdiction includes all crimes which are punishable by a fine of not more than $5000 or imprisonment for not more than five years or both. General Statutes § 54-1a. Since none of the offenses with which the plaintiff was initially charged, nor the offense to which he pleaded guilty, provides for a penalty in excess of the statutory jurisdiction of the Circuit

Court, none of the remedies available under *Santobello,* supra, would raise jurisdictional questions were it not for the impingement of the Circuit Court's criminal jurisdiction upon the constitutional prerogatives of the Superior Court.

Our state constitution, in article second, divides the powers of government into three distinct departments, namely, legislative, executive and judicial, and assigns to each a separate magistracy. Under article fifth § 1, the judicial power is vested in "a supreme court, a superior court, and such lower courts as the general assembly shall, from time to time, ordain and establish." The judicial structure prescribed by the constitution is a three-tiered system consisting of a constitutional appellate court of last resort, a constitutional trial court of general jurisdiction, and statutory lower courts of limited jurisdiction. The Superior Court, the constitutionally designated court of general jurisdiction, was established long before the adoption of our state constitution in 1818. It was the intent of the constitution that this court should continue with the essential characteristics which it had previously possessed. *Walkinshaw* v. *O'Brien,* 130 Conn. 122, 127. The legislature possesses no authority to deprive the Superior Court of its essential jurisdiction, either by creation of another court with exclusive or concurrent jurisdiction so extensive as materially to detract from the jurisdiction of the Superior Court; id., 140; or by giving another court jurisdiction of matters which lie exclusively within the constitutional jurisdiction of the Superior Court.

Prior to *Walkinshaw,* arguably, any statewide court other than the Superior Court was constitutionally impermissible. *Osborn* v. *Zoning Board of Appeals,* 11 Conn. Sup. 489, 514. *Walkinshaw* decided otherwise (p. 139) but not without a caveat that the fact that the statutory court sits as one

court throughout the state might be a factor to be considered in determining whether the legislature, in creating it, has breached the constitutional barriers. It would serve no useful purpose to repeat here the brilliant historical analysis in *Osborn* or the equally extensive constitutional discussion in *Walkinshaw*. What is of greater significance for the present case is that in the face of a sharp dissent expressing the fear of further encroachment by the legislature the majority, "[n]ot without considerable hesitance," approved the newly created state Court of Common Pleas. *Walkinshaw* v. *O'Brien*, supra, 144.

What was this new court which just barely passed muster? Under chapter 283 of the 1941 Supplement to the General Statutes, this court "was given exclusive jurisdiction of legal actions wherein the matter in demand exceeded $100 but did not exceed $2500, of equitable actions wherein the matter in demand did not exceed that sum, and of appeals from municipal boards, officers and commissions and from the liquor control commission; and concurrent jurisdiction with the Superior Court of actions for the foreclosure of mortgages or liens wherein the matter in demand exceeded $2500; General Statutes, Sup. 1941, §§ 808f–810f." *Walkinshaw* v. *O'Brien*, supra, 126. Its criminal jurisdiction was limited to appeals from justices of the peace and municipal courts. The maximum criminal jurisdiction at that time of any municipal court was limited to crimes wherein the penalty provided did not exceed a fine of $500 or imprisonment for one year or both. Rev. 1949 § 7579.

There were three significant changes wrought by the act of 1941: the new court was changed from several county courts to a single state court, the exclusive civil jurisdiction was changed from $100 to $500 to $100 to $2500, and the new court was

given exclusive jurisdiction of statutory appeals from municipal boards, officers and commissions and from the liquor control commission. Except for the quantum jump from local to state court the new court, in the eyes of the *Walkinshaw* majority, did not appear to be too much different, in a jurisdictional sense, from the old county courts, which had had concurrent jurisdiction with the Superior Court of all actions claiming either legal or equitable relief wherein the matter in demand exceeded $500 but did not exceed $2000. Cum. Sup. 1939, § 1396e. The upper limit increase of civil jurisdiction from $2000 to $2500 was not too great. As for the change from concurrent to exclusive jurisdiction, this did not overly disturb the *Walkinshaw* majority, because in its view there was no material distinction between the two insofar as impairment of the constitutional jurisdiction of the Superior Court was affected. *Walkinshaw* v. *O'Brien,* supra, 138. Respecting the observation in the *Walkinshaw* dissent (p. 149) that "between 1818 and 1941 the legislature by degrees, but none the less progressively and effectively, had been gradually depriving the Superior Court of jurisdiction," the *Walkinshaw* majority was satisfied that its warning (p. 144) "that in the broad grant of jurisdiction to the Court of Common Pleas, summing up as it does the various extensions of jurisdiction which through the years have been made as regards the former Courts of Common Pleas, the General Assembly has trenched far upon the jurisdiction of the Superior Court as it existed when the constitution of 1818 became effective, and the question whether the act can be sustained is a very close one," was sufficient to prevent a further metastasis of the constitutional judicial structure.

Although the *Walkinshaw* majority may have thought that in yielding to the legislative will with respect to the state Court of Common Pleas it was

stemming the tide of encroachment upon the jurisdiction of the Superior Court, in actuality its decision served only to open the sluice gates. Since then not only has the civil jurisdiction of the Court of Common Pleas been increased to $15,000; General Statutes § 52-6; and in certain instances to an unlimited amount; § 52-31; but the court also has been given jurisdiction of appeals from virtually all municipal and state agencies. Public Acts 1971, No. 870. In addition, the legislature has created another statewide court, the Circuit Court, whose criminal jurisdiction is the subject matter of this proceeding.

The Circuit Court was established by the 1959 session of the General Assembly; Public Acts 1959, No. 28; to perform the judicial functions of the justices of the peace and the town, city and borough courts. *Collins* v. *York,* 159 Conn. 150, 160. The Circuit Court in 1965 was given jurisdiction of all civil matters, legal or equitable, not triable by law only by the Superior Court or the Court of Common Pleas or a judge of those courts, wherein the matter in demand did not exceed $7500. Public Acts, Spec. Sess., Feb. 1965, No. 331 § 29; General Statutes § 52-2a. It was originally given criminal jurisdiction of all crimes and local offenses punishable by a maximum fine of $500 or a maximum imprisonment of one year or both, and, in the case of a crime carrying a maximum penalty of a fine of $1000 or imprisonment for five years or both, the court could take jurisdiction and impose no greater imprisonment than one year unless, because of the aggravated nature of the offense, the prosecutor recommended a hearing in probable cause, in which case such a hearing would be conducted and, if probable cause was found, the accused would be bound over to the court having jurisdiction. Public Acts 1959, No. 28 § 25; General Statutes § 54-1a. The criminal jurisdiction of this new statewide court was the

same as that previously held by the town, city and borough courts in municipalities having a population of 15,000 or more. General Statutes §§ 54-6, 54-7. In 1971, § 54-1a was amended to give the Circuit Court final jurisdiction of crimes with a maximum penalty of five years. Public Acts 1971, No. 870 § 1; see *State* v. *Campane*, 76 Conn. 549, 550.

When one contemplates the creation and steady expansion of the state Court of Common Pleas and the state Circuit Court, it is apparent that the judicial plug fashioned by *Walkinshaw* has metamorphosed into a legislative gouge which over the years, under such high sounding and deceptively appealing titles as "court reorganization" and "court reform," has tended to erode the jurisdiction of the Superior Court by the creation of legislative replicas.

It is well to remember that the state's constitutional system was established, not by the grace of the legislature nor by the fiat of the judiciary, but rather by the will of the people. "The people made the constitution, and the people can unmake it. It is the creature of their will, and lives only by their will. But this supreme and irresistible power to make or to unmake, resides only in the whole body of the people; not in any sub-division of them." *Cohens* v. *Virginia,* 19 U.S. (6 Wheat.) 264, 389. Although members of all three branches of government take an oath to support and defend the constitution of the state; General Statutes § 1-25; historically and traditionally it is the judicial branch which has been given the unenviable but essential role of protector of the constitution through the process of judicial review. "The interpretation of the laws is the proper and peculiar province of the courts. A constitution is, in fact, and must be, regarded by the judges, as a fundamental law. It, therefore, belongs to them to ascertain its meaning, as well

as the meaning of any particular act proceeding from the legislative body. . . . Nor does this conclusion by any means suppose a superiority of the judicial to the legislative power. It only supposes that the power of the people is superior to both; and that where the will of the legislature, declared in its statutes, stands in opposition to that of the people, declared in the Constitution, the judges ought to be governed by the latter rather than the former." Hamilton, The Federalist, No. 78 (New York: Colonial Press, 1901, p. 430).

A constitutional trial court with an independent judiciary serves to protect the public interest by insulating the judicial process from the influence of pressure groups and from reprisal by the legislature. If, as a result, the legislature is frustrated from time to time because it cannot work its will, how much more so would the people be frustrated if the legislature were free to interfere with the judicial process by tampering with a court's constitutional jurisdiction! *Walkinshaw* was the foot in the door. Since then the civil jurisdiction of the statutory courts gradually has been increased. Now we are witnessing an expansion of criminal jurisdiction. The combined civil and criminal jurisdiction of both the Court of Common Pleas and the Circuit Court is such that by a process of legislative domain they have become other courts, not the lower courts contemplated by the constitution.

Giving the Circuit Court final jurisdiction of crimes involving a sentence of more than one year is no small matter. The one-year barrier is the checkpoint between misdemeanors and felonies. General Statutes § 53a-25. Ordinarily, sentences for felonies are indeterminate, with a minimum of one year and the maximum determined by the felony classification. Ibid. Class D felonies carry a maximum term of five years. § 53a-35 (b) (4). Included

in this category are such crimes as assault in the second degree, which covers, inter alia, assaults with a dangerous weapon; § 53a-60; burglary in the third degree, which covers breaking and entering a building with criminal intent; § 53a-103; larceny in the second degree, which includes theft of a motor vehicle; § 53a-123; robbery in the third degree; § 53a-136; forgery in the first degree; § 53a-138; bribery; § 53a-147; perjury; § 53a-156; rigging a contest; § 53a-162; and the unclassified felony of possession of a narcotic drug. § 19-481 (a). The prosecution of these crimes, and others in the class D felony category, represents a significant portion of the criminal jurisdiction of the Superior Court. Conn. Judicial Council 23d Rep., pp. 35–42 (1972). In addition, through the process of plea bargaining there is nothing to prevent the Circuit Court from taking jurisdiction in cases where the initial charge calls for a maximum of ten or twenty years but where the actual sentence does not exceed five years. This can be accomplished with relative ease by the filing of a substitute complaint charging a lesser crime within the court's jurisdiction. Thus, unless a halt is called at this juncture to this steady process of erosion of the constitutionally established judicial structure, once the misdemeanor-felony barrier is broken there will be nothing to prevent further incursions by the legislature until the time will come when the legislature will have created a state court with virtually the same jurisdiction as the Superior Court, at which time the Superior Court will have become the Ozymandian relic of the judicial system.

Thus far we have discussed this case without adverting to the fact that *Walkinshaw* was construing the constitution of 1818 and not the constitution of 1965, under which we are now operating. The defendant suggests that, when we view the present constitution in the context of the judicial structure

in existence at the time of its adoption in 1965, the criminal jurisdiction given to the Circuit Court in the present formulation of § 54-1a does not trench upon the constitutional structure of the Superior Court.

In 1965 there were three trial courts in the state—the constitutionally constituted Superior Court and the statutory courts—Common Pleas and Circuit. The jurisdiction of the Court of Common Pleas was limited to civil matters. The Circuit Court had both civil and criminal jurisdiction, its civil jurisdiction limited, under § 52-2a, to claims not exceeding $7500 in amount, and its final criminal jurisdiction, under § 54-1a, limited to crimes punishable by a certain fine or by imprisonment for not more than one year or both.

The constitutional convention of 1965 did not meet in a legal vacuum. Although convened to deal with the question of legislative reapportionment, the convention dealt with other matters as well, including a review of the judicial article. Introduced at the convention was Resolution 177, which would have vested the judicial power "in a supreme court, a superior court, and such other courts as the general assembly shall from time to time, ordain and establish." Conn. Const. Convention 1965, Resolutions, No. 177. In view of the fact that among the delegates to the convention were three former members of the Supreme Court, two of whom—former chief justices—were cochairmen of the convention, the adoption of the proposed resolution, in the light of the legal gloss placed upon article fifth of the constitution of 1818 by *Walkinshaw,* would have been significant. Instead, the convention adopted a resolution substituting the word "lower" for "inferior" in respect to the statutory courts. Conn. Const. art. V § 1. In the debate on this proposal, it was explained that the purpose of the change was to remove the

unfavorable connotation of low quality sometimes attached to the word "inferior." Conn. Const. Convention Proc. (1965), pt. 3, p. 763. By not considering Resolution 177 and by making the change in the judicial article which it did, it is clear that the convention did not intend to change the basic three-tiered judicial structure envisioned in the original constitution nor to give the legislature any power to apportion jurisdiction between the Superior Court and the lower courts which it did not have under the constitution of 1818. Since at the time of the 1965 convention the Circuit Court possessed final jurisdiction only for misdemeanor penalties, the caveat expressed in *Walkinshaw* (130 Conn. at 144) respecting the cumulative effect of expanding the jurisdiction of lower courts at the expense of the Superior Court remains the operative guiding light in an examination of any new grants of jurisdiction to lower courts and governs the consideration of the expanded criminal jurisdiction presently contained in § 54-1a.

In sum, whether viewed against the backdrop of the 1818 constitution or the 1965 constitution, the expansion of the final criminal jurisdiction of the Circuit Court into the felony area produces a significant distortion of the state's judicial picture to the detriment of the Superior Court. While it is true, as the defendant contends, that the Superior Court has not been ousted of criminal jurisdiction, the enlargement of the concurrent criminal jurisdiction of the Circuit Court has the same effect and vastly accelerates the process of rendering the Superior Court an empty constitutional shell. It is to prevent further deterioration of the constitutional judicial structure that we are constrained to hold that insofar as § 54-1a authorizes the Circuit Court to impose a sentence in excess of one year it is invalid. In the circumstances, the Circuit Court

lacks the authority to put into effect either the actual sentence of eighteen months to three years or the recommended sentence of one to two years.

Accordingly, the writ is granted and the plaintiff is ordered discharged from custody unless within thirty days from date hereof the Circuit Court vacates his conviction and erases his guilty plea, and thereafter within a reasonable time conducts a hearing in probable cause to determine whether he should be bound over to the Superior Court.